**William D. COHAN, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. Nos. 19649, 20104.**

United States District Court E. D. Michigan, S. D.

Aug. 18, 1961.

Raymond, Chirco, Fletcher, Cohan & Donaldson, by J. Bruce Donaldson, Detroit, Mich., for plaintiff.

Lawrence Gubow, U. S. Atty., Orrin Jones, Asst. U. S. Atty., Detroit, Mich. (John B. Jones, Jr., Acting Asst. Atty. Gen., Lyle M. Turner, Jerome Fink, John D. Stobbs, U. S. Dept. of Justice, Washington, D. C., on the brief), for defendant.

FEIKENS, District Judge.

In these two cases plaintiff, a member of the Detroit Yacht Club, seeks to recover certain excise taxes on club charges from the government. By reason of stipulation filed by the parties hereto, the Court finds the following facts:

### Findings of Fact

1. The Detroit Yacht Club was incorporated in 1895 under the laws of the State of Michigan as a nonprofit corporation. The purposes of the Club as shown in its Articles of Incorporation are:

> "The purposes and object of this association is to engage in yachting, boating, and other kindred sports for pleasure and exercise, and to promote and foster these objects."

Conduct and operation of the Club are subject to its By-laws. The Club is a social organization within the meaning of Section 501(c), Internal Revenue Code of 1954, 26 U.S.C.A. § 501(c), and, therefore, is exempt from Federal income tax.

2. During the years 1955 through 1959 there were the following number of members in each of the indicated classes:

| Membership Class | 1955 | 1956 | 1957 | 1958 | 1959 |
|---|---|---|---|---|---|
| Honorary | | | — no records available — | | |
| Life | 6 | 6 | 5 | 4 | 3 |
| Active | 2506 | 2573 | 2591 | 2566 | 2498 |
| Intermediate | 116 | 144 | 161 | 167 | 142 |
| Junior | 114 | 106 | 87 | 89 | 78 |
| Nonresident | 308 | 349 | 381 | 419 | 457 |
| Military & Clergy | 31 | 34 | 42 | 42 | 49 |
| Total | 3081 | 3212 | 3287 | 3287 | 3227 |

3. The plaintiff, William D. Cohan, is a citizen of The United States, residing in Grosse Pointe Farms, Michigan. The plaintiff is, and has been, an Active Member of the Detroit Yacht Club at all times material to this proceeding.

4. During the period 1955 through October 1, 1957, the dues of Active Members of the Club were $150 per annum. Effective as of October 1, 1957, the dues of Active Members of the Club were increased to $175 and remained at this amount during the balance of the period involved herein.

5. The Detroit Yacht Club sponsors regular social and sporting events for its members. It has dancing three or four nights weekly, movies twice a week, and periodically throughout the year special occasion parties, dinners, and dances are held. Each year it sponsors the Silver Cup Race on the Detroit River for unlimited class high speed powerboats. Participation in the latter event is not limited to Club members. There is also a regular schedule of sporting events during the year for members, including intra-club and inter-club sailboat races, a bowling league, and a swimming team for children of members, which competes against teams from other clubs.

With the exception of special occasion parties, the Club makes no charge to members for participation in these events, as the annual dues paid by a member give him that right.

There are various social groups within the Club, some of which make a charge to participants in the group. However, these charges are not made by the Club or collected by it.

6. The physical plant of the Club consists of the following:

(a) A three-story clubhouse containing five dining rooms, a ballroom, several lounges, two bars, three private party rooms, two kitchens, several washrooms and toilet facilities, administration offices, a barber shop, a masseur room, a clothes pressing shop, a manager's apartment, a pistol range, two squash courts, a swimming pool, numerous storage rooms, a men's locker room and women's locker room.

(b) Fifteen to twenty small sailboats.

(c) Mooring services and wells for members' boats.

(d) Playground equipment for use of members' children.

(e) A parking lot.

An active member is entitled, without additional charge, fee or rental payment, to the use of all of the above-described physical accommodations, facilities and equipment. However, where a Club member desires to retain on a seasonal basis a specific locker or boatwell, he is required to pay the Club an additional charge and in order to use the club-owned sailboats, a member must obtain a "Skipper's Card" for which there is an additional charge. A member receives the magazine "Main Sheet" upon his

payment of the annual subscription charge.

7. An Active Member of the Club has available the following services:

(a) Meals and beverages.

(b) A harbormaster and crew.

(c) Storage space for sailboat masts and other spars in an open area in the locker room or in an open yard area at one end of the Club island.

(d) A barber and a masseur.

(e) Valet services.

(f) Catering services for private parties and social activities.

(g) The use of the Club's sailboats (provided the member secures a Skipper's Card as hereinafter explained).

8. The men's locker room is located on the first floor of the main clubhouse. It is a distance of about 100 feet from the nearest boatwell and about 750 feet from the farthest boatwell. The indoor swimming pool is located one-half floor above the men's locker room.

9. During the years involved, the men's locker room contained the following number and types of individual metal storage lockers:

| Number | Type | Height | Width | Depth |
|---|---|---|---|---|
| 658 | A | 73½″ | 14″ | 17½″ |
| 191 | B | 83½″ | 31½″ | 37½″ |
| 8 | C | 106½″ | 48½″ | 60″ |
| 29 | D | 83½″ | 31½″ | 30″ |
| 9 | E | 97″ | 43¾″ | 48″ |
| 55 | F | 72½″ | 18″ | 21″ |

10. Twenty-nine of the men's A-type lockers are not leased by the Club and are kept available at all times during the year for use of members or guests without charge. The remaining lockers were rented by the Club to members at the following rates:

| Type | Yearly Rental |
|---|---|
| A | $ 9.00 |
| B | 15.00 |
| C | 21.00 |
| D | 15.00 |
| E | 27.00 |
| F | 12.00 |

11. During the years involved, the women's locker room contained the following number and types of individual metal storage lockers and baskets:

| | Number | Type | Height | Width | Depth |
|---|---|---|---|---|---|
| Locker: | 320 | A | 73½″ | 14″ | 17½″ |
| | 149 | B | 73½″ | 7″ | 17½″ |
| Baskets: | 112 | | 12″ | 7″ | 9″ |

12. Twenty-four of the women's B-type lockers and 88 of the baskets are not leased and were available at all times during the year for use of members, members' wives, or guests without charge. The remaining lockers and baskets were rented by the Club to members, or their wives, at the following rates:

| | Type | Yearly Rental |
|---|---|---|
| Lockers: | A | $9.00 |
| | B | 6.00 |
| Baskets: | | 3.00 |

13. During 1956, 1957, and 1958, plaintiff rented an A-type locker, in the men's locker room, for which he paid $9 per year; during 1959 a B-type locker was rented for which he paid $15 per year. During 1958 and 1959 plaintiff also rented one ladies' B-type locker for his wife and paid a rental of $6 per year.

A member who rents a locker on an annual basis receives his personal key to that locker. A member who uses one of the lockers kept available for the general membership does not receive a key.

14. The Detroit Yacht Club maintains a number of boat docks abutting the island on which it is located; space for 203 power boats and 75 sailboats is available. The June, 1959 issue of the magazine "Main Sheet" shows that among the Club members 81 owned sailing boats and 345 owned power boats at that time.

A member who wishes to use a specific boatwell on a seasonal basis must pay the required charge to the Club. One who rents a specific boatwell is also entitled to the exclusive use of a storage shed which is located on the dock at the foot of the boatwell.

If a rented well is vacant, a Club member may use it on a temporary basis. Under the Club's By-laws, permission to use wells must be obtained from the Dock Committee or from the manager. The Dock Committee has delegated to the harbormaster the discretion to assign boats on a temporary basis to vacant rented wells. In such cases, the member, who is not a well renter, is not entitled to use the storage shed located at the foot of the well.

The charge or dockage fee is dependent upon the measured length of the craft to be moored in the space and entitles the leasing member to the exclusive use of the leased well during the period of the lease. During the period involved, dockage fees were $1.85, $2.85, or $3 per boat foot depending upon the type of boat and location of the moorage space.

15. The plaintiff moored his 18' sailboat Sea-Bee in boatwell No. 7 at the Detroit Yacht Club for part of the summer 1957 and was charged for half a season's rental at the rate of $1.85 a foot. Plaintiff paid the Club during the year 1957 a total rental of $16.65, plus 20% Federal excise tax of $3.33.

16. The "Main Sheet" is a monthly magazine. The masthead of the magazine states it is the official publication of the Detroit Yacht Club. In general, the magazine contains pictures and short articles concerning happenings and events at the Club, and other special articles of wider interest on such subjects as boating. Advertising is also included in the magazine.

17. The "Main Sheet" is not available for purchase on newsstands. The circulation of the "Main Sheet" is limited to those members, or persons, who subscribe. No member of the Club is required to subscribe to the "Main Sheet" and not all members do subscribe to the magazine; subscriptions to the magazine are not limited to members and a few nonmembers subscribe. Issues containing articles of special interest are occasionally mailed to sports magazine editors, newspaper editors or individuals who may be interested in a particular story.

During the period involved between 95 and 98 per cent of the total Club membership subscribed to the "Main Sheet." There were approximately ten nonmembers who subscribed, some of whom had formerly been members of the Club.

When a member first joins the Club, he is given a complimentary copy of the annual roster issue of "Main Sheet," which contains a list of the membership, a copy of the Club's By-laws and the Club's house rules. Subscriptions are billed by and paid to the Club on an annual basis.

18. The "Main Sheet" is not the official organ of the Club for apprising the membership of the scheduled activities, special events and social doings of the Club. The "Log," a six-page, fold-in-two brochure, performs this official function. The "Log" is edited and prepared by the

Entertainment Committee of the Club and is mailed monthly free of charge to all members. The "Main Sheet" at times does indicate important events that will take place at the Club.

19. During the years 1955 through 1959, the annual subscription price for the "Main Sheet" was $2; effective January 1, 1959, this amount was increased to $3. During the years 1955 through 1959, the plaintiff subscribed to the "Main Sheet" and paid the annual subscription price.

20. "Main Sheet" has been published for approximately forty years. Since 1948 the "Main Sheet" has been published by Joseph Bauser of Detroit, Michigan, pursuant to a verbal agreement between him and the Club. Mr. Bauser devotes his full time to the preparation and publication of the magazine, and has complete authority and control as to the makeup and content of the publication. The terms and conditions of the verbal contract are as follows:

Mr. Bauser agrees to:

(a) Edit, publish and mail each month a magazine of high quality format, editorial and photographic content, the number of pages of which are determined by the number of pages of advertising sold.

(b) Secure advertising for products and services from individuals and organizations of integrity. (An advertiser need not be a Club member; however, many advertisers are Club members.)

(c) Select, prepare and edit articles of Club and membership activities and articles of general interest.

(d) Photograph Club and other activities for publication in the magazine.

(e) Furnish layouts, art work, printing plates and printing.

(f) Purchase envelopes for the magazine, sort same into postal office. The envelopes themselves are addressed by the Detroit Yacht Club, since the Club does not want its membership list available to general advertisers.

(g) The magazine is printed by the Mulford Printing Company located in Detroit, Michigan. Envelopes are stuffed at the Burkhart Bindery, also in Detroit. Both Mulford Printing and Burkhart Bindery are retained and paid by Mr. Bauser.

The Detroit Yacht Club agrees to:

(a) Bill and collect the annual subscription price of the magazine from subscribing members.

(b) Remit monthly to Mr. Bauser the subscription price of the magazine, based upon the number of magazines mailed or delivered during the month (this fluctuates each month with the addition of new members and deletion by death, etc.)

(c) Maintain the mailing list and address the "Main Sheet" envelopes.

Under the terms of this agreement, the Club annually bills those members who subscribe to the "Main Sheet" and subsequently pays the subscriptions to Bauser, based on the number of magazines mailed or delivered each month; the subscription price is separately identified and set out on the billing statements of the Club. In addition to the subscription price, paid as aforementioned, Bauser is entitled to all advertising proceeds of the magazine; all advertising rates are set by Mr. Bauser; he bills the advertisers monthly for space taken and the billed amounts are paid to him directly by the advertisers. The Club realizes no pecuniary profit from the magazine "Main Sheet."

During the years involved, Mr. Bauser was paid the amounts set out on Exhibit D, which is attached hereto. No other amounts were paid to Bauser. He was also provided a rent-free office on the Club premises. He devoted full time to preparation and publication of the magazine. He was not listed in the telephone directory during that time as a publisher or under a business name. The Club did not withhold Federal income tax from the payments to Bauser and did not pay social security tax on these payments.

The Club does not carry Bauser on its payroll records or on its employment rolls

maintained for purposes of the so-called social security tax provisions and does not pay over, as either the employer's contribution or withheld employee's contribution, any amount as social security tax; Mr. Bauser, during the period involved, filed his Federal income tax returns on the basis of a self-employed person and pursuant thereto filed estimated quarterly income tax returns and, upon his final return for each year, paid the tax imposed upon self-employment income.

Mr. Bauser maintains a registered assumed name, "Main Sheet," under the laws of the State of Michigan. Bauser is licensed, under a second class mailing certificate, by the Post Office Department, which license is utilized for the mailing of the "Main Sheet." The expenses incident to maintenance of the assumed name and the second class license are borne by Bauser and are as follows:

Second Class
 Mailing Permit $55.00 per month
Assumed Name
 Fee $ 5.00 annually

The annual subscription price of "Main Sheet" was increased effective January 1, 1959, after Mr. Bauser discussed the matter with the Club's Board of Directors.

The subscription price does not cover the entire cost of publishing the magazine.

The subscription price to the non-Club members who subscribe was $1 per year higher than the subscription price to Club members.

21. Mr. Bauser is not a member of the Club but holds a courtesy card, the same as is extended to members of the press, radio and television fields. The courtesy card entitles Mr. Bauser to charge items at the Club.

22. Material for publication in the magazine is obtained by Mr. Bauser from various sources, including:

(a) Through personal contact with committee chairmen and Club members.

(b) From correspondents appointed by certain large groups within the Club, who forward articles and notes of interest.

(c) From the Detroit Yacht Club Log, a six-page, fold-in-two brochure which contains the dates of all coming events at the Club. (The Log is edited by the Entertainment Committee of the Club.)

(d) Miscellaneous sources, such as newspaper sportswriters and feature writers, the Detroit Historical Commission, and Michigan Waterways Commission.

Some of the social groups within the Club designate a person to regularly report to Mr. Bauser the activities of that group, so that this news will appear in "Main Sheet."

23. For the years 1955, 1956, 1957 and 1958, the plaintiff was issued a so-called "Skipper's Card" by the Club for which he paid an annual charge of $12. The possession of the card entitled him to use the sailboats owned by the Club at such time as they were available.

24. During the years 1955 through 1959, the Club issued approximately 137 to 167 "Skipper's Cards" of which approximately 20 each year were issued without charge to members of the Catboat Committee. This Committee instructs novice sailors in the sport of sailing; Club catboats are used to instruct these novices. The other cards were issued to members of the Club who had demonstrated sufficient proficiency in the handling of a sailboat, who requested issuance and who paid the $12 annual charge.

25. The amounts paid by the plaintiff to the Detroit Yacht Club for locker rentals, dockage fees, magazine "Main Sheet" and "Skipper's Cards" during the years involved in these actions were itemized separately on the Club's bills and statements rendered to plaintiff and were in addition to the annual membership dues. The Club collected and remitted to the Commissioner of Internal Revenue, excise tax at the rate of 20 per cent on all membership dues, locker rentals and

dockage fees. The Club did not collect or remit excise tax on the amounts received from members as the subscription price of the "Main Sheet" or as charges for issuance of the "Skipper's Cards" except the amounts paid by the plaintiff as described below.

26. Plaintiff, during the years 1956 through 1959, paid amounts as Federal excise taxes, under Sections 4241 through 4243, Internal Revenue Code of 1954, 26 U.S.C.A. §§ 4241–4243, on locker rentals and boat dockage fees to the Detroit Yacht Club. The following schedule sets out the year and amounts paid as locker rental, excise tax on locker rental, dockage fees and excise tax on dockage fees.

| Year | Locker Rental | Excise Tax | Dockage Fee | Excise Tax |
|------|---------------|------------|-------------|------------|
| 1956 | $ 9.00 | $1.80 | $ | $ |
| 1957 | 9.00 | 1.80 | 16.65 | 3.33 |
| 1958 | 15.00 | 3.00 | | |
| 1959 | 21.00 | 4.20 | | |

The amounts of rental and tax as shown above were paid by the plaintiff directly to the Detroit Yacht Club; thereafter, the amount of the excise tax was paid over to the District Director of Internal Revenue, Detroit, Michigan, by the Detroit Yacht Club.

27. In addition to the amounts set forth above, on January 15, 1960, plaintiff paid $12.40 as Federal Excise Tax on the annual cost of the Detroit Yacht Club magazine "Main Sheet" and for the annual charge for the Club sailing "Skipper's Card." The following schedule sets out the year and amounts paid:

| | Charge for Main Sheet | Excise Tax | Charge for Skipper's Card | Excise Tax |
|------|-----------------------|------------|---------------------------|------------|
| 1955 | $2.00 | $ .40 | $12.00 | $2.40 |
| 1956 | 2.00 | .40 | 12.00 | 2.40 |
| 1957 | 2.00 | .40 | 12.00 | 2.40 |
| 1958 | 2.00 | .40 | 12.00 | 2.40 |
| 1959 | 3.00 | .60 | — | — |
| | | $2.20 | | $9.60 |

Said tax was paid as the result of an audit of the books and records of the Detroit Yacht Club and a determination by the examining agent that these amounts were legally due.

The amounts as shown above were paid by the plaintiff directly to the Detroit Yacht Club; thereafter the amount of the excise tax ($12.40) was paid over to the District Director of Internal Revenue, Detroit, Michigan, by the Detroit Yacht Club check number 568, dated January 27, 1960, in the amount of $247.-37.

28. The Detroit Yacht Club filed timely quarterly Federal excise tax returns for each of the taxable quarters for the years 1955, 1956, 1957, 1958 and 1959. On each of these returns the Club entered an amount of tax liability on the appropriate line for the category of tax identified on the returns as "Club Dues,

initiation fees, life membership." The amounts reported on the returns as subject to the tax and/or tax owing did not include the amounts collected by the Club for "Skipper's Cards" and magazine "Main Sheet" subscriptions.

29. The plaintiff filed timely claims for refund with the Director of Internal Revenue, Detroit, Michigan, seeking refund of the Federal excise tax paid by him on the subscription of the magazine "Main Sheet," on dockage fees, on locker rental payments and the amount paid for issuance of the "Skipper's Card" in the amounts and for the years particularized above. The District Director, by registered mail, denied each refund claim in all respects.

30. All charges collected by the Club for lockers, boatwells, "Skipper's Card" and "Main Sheet" were deposited in the general Club funds; all Club expenses were paid from general Club funds. No effort was made to earmark these amounts for maintenance of the accommodations for which charges were made.

31. The Detroit Yacht Club makes available the lockers, boatwells, catboats, and the magazine "Main Sheet" for the convenience of members and as a part of the services it offers members in furtherance of Club purposes.

Since this Court has jurisdiction in accordance with Title 28, Sec. 1346(a), U.S.C., it entertains plaintiff's motion and defendant's cross motion for summary judgment.

Plaintiff seeks recovery of $25.93 from defendant, claiming this amount to be the exaction of erroneously collected excise tax together with interest thereon. Plaintiff also claims that the statute of limitations (Sec. 6501, Internal Revenue Code of 1954, 26 U.S.C.A. § 6501) bars assessment and collection of the tax as it applies to the charges for the club magazine "Main Sheet" and the skipper's card for the years 1955, 1956 and 1957.

Defendant, by cross motion, seeks summary judgment in its favor contending that the tax levied and collected was lawful exaction.

### Conclusions of Law

Title 26, Sec. 4241(a) (1) provides:

"There is hereby imposed—A tax equivalent to 20% of any amount paid as dues or membership fees to any social, athletic, or sporting club or organization, if the dues or fees of an active resident annual member are in excess of $10.00 per year."

And, Sec. 4242(a) reads:

"As used in this part the term 'dues' includes any assessment, irrespective of the purpose for which made, and any charges for social privileges or facilities, or for golf, tennis, polo, swimming, or other athletic or sporting privileges or facilities, for any period of more than six days * * *."

The issue is this: Are the charges in this instance made by the Detroit Yacht Club for individual lockers, a boatwell, the magazine "Main Sheet" and a skipper's card "charges for social privileges or facilities, or for golf, tennis, polo, swimming, or other athletic or sporting privileges or facilities, for any period of more than six days"?

In order to put this question in sharpest focus, let it first be said that the excise tax exacted on charges for the magazine "Main Sheet" are improper. I find that the charges for this magazine were collected by the club as a matter of convenience and that they were in reality paid by the members of the club, plaintiff included, to one Joseph Bauser. I find from the facts submitted that Mr. Bauser under all of the circumstances is an independent contractor or concessionaire and that therefore the amounts paid to him and collected by the club as a matter of convenience are not an "amount *paid* * * * to any social, athletic, or sporting club or organization."

The question is therefore directed to the charges made for the individual locker, the boatwell and the skipper's card.

Plaintiff contends that the excise tax cannot be levied against a charge

made by the club for a facility even though used for more than 6 days if the use of the facility at the time of its use was a use not in common with the club membership. Thus, plaintiff argues, a locker specifically used by him or his wife in their individual capacities cannot be used in common with the club membership. Likewise, plaintiff claims a boatwell used only for the purpose of docking his own boat is not a use of that boatwell in common with the club membership. Plaintiff also contends that the use of the facility or privilege in any event must be for an inherently and primarily social, athletic or sporting purpose.

The difficulty with these contentions is that they are not in accord with the plain language of the statute. This statute, Sec. 4242, Title 26 U.S.C. was first enacted in 1941 and was known as Sec. 543(b) of the Revenue Act of 1941. Prior thereto dues were defined by Sec. 413 of the Revenue Act of 1928. Subsection (d) thereof provided:

"As used in this section, the term 'dues' includes any assessment irrespective of the purpose for which made; and the term 'initiation fees,' includes any payment, contribution or loan required as a condition precedent to membership, whether or not any such payment, contribution, or loan is evidenced by a certificate of interest or indebtedness or share of stock, and irrespective of the person or organization to whom paid, contributed, or loaned."

In the 1941 act alluded to, the first mention is made of

"charges for social privileges or facilities * * * or other athletic or sporting privileges or facilities, for any period of more than 6 days."

Weld v. Nichols, D.C., 9 F.2d 977, is clearly inapplicable. Plaintiff, however, finds comfort in White v. Winchester Club, 315 U.S. 32, 62 S.Ct. 425, 430, 86 L.Ed. 619, but it must be remembered that White decided a specific situation under the 1928 Act. If the question before the Court in White had arisen under the present statutory definition, it is clear from the opinion that that section would have included the type of golfing privilege payments involved. It is perhaps because the 1941 statutory definition was not before the Court in White that the Court announced its test by which the applicability of the 1928 Section was to be judged. The Court said:

"Payment of the price of an individual dinner at the club dining room or of a single round of golf lacks the element of making common cause inherent in the idea of club activity. * * * payment for the right to repeated and general use of a common club facility for an appreciable period of time has that element and amounts to a 'due or membership fee' if the payment is not fixed by each occasion of actual use."

It is tempting to point out that even the test in White does not support plaintiff's claim. White does not say that the individual and exclusive use of a club facility exempts one from the tax. Only one golfer can occupy and use a tee or a green at one time. Only one club member can use one locker at one time and even in the case of a club facility used in common, for example a swimming pool, a user exclusively occupies that portion of the pool in which he is.

All club facilities in the final analysis are used by individuals. It is in the ultimate fact that club members act in concert in the acquisition, ownership and management of club facilities and privileges and provide these facilities and privileges for use either to individual members as in the case of lockers or sailboats or boatwells or for use by groups of club members as in the case of a club's golf course or swimming pool that the rationale is found. The right to use a club facility or privilege sets the standard—the actual use for more than 6 days makes the charge therefor taxable.

Nor does plaintiff's suggested test that the facility or privilege must be *inherent-*

*ly* and *primarily* social, athletic or sporting before the tax applies afford significant help. The words "inherently" and "primarily" are not used in the statute. To adopt them in this context would amount to a modification of its plain meaning and this cannot and should not be done on the pretext that it amounts to an interpretation of the meaning. As *Knoll Golf Club v. United States,* D.C., 179 F.Supp. 377, 379 points out:

> "Clearly, the congressional purpose in enacting these provisions was to impose a luxury tax."

Heretofore the tax applied to club dues and assessments. Now, additionally, it applies to club charges for the use of the club's privileges and facilities if used for more than 6 days. It is obviously congressional intent to apply the tax to any payment for the luxury of membership in a social, athletic or sporting club and to the charges for the use of such club's facilities or privileges.

Finally, should this tax not be applied since for some 15 years it was not exacted as against charges for facilities or privileges of the types mentioned? I think not. Simply because the tax collector may have been remiss in his duties is no basis for saying that the tax law should not be observed. It is not for this Court to speculate why enforcement of the 1941 statute did not begin until 1955 if such be the case. (That such is likely so seems evident from the lack of controversy at the administrative level and the lack of court decisions in the judiciary.)

While Hartshorne, J., was faced with decision in December, 1959, in Knoll Golf Club v. United States, D.C., 179 F.Supp. 377, no other recent cases [1] point the way. It is sufficient to say that notwithstanding plaintiff's argument pointing to tax regulations and bulletins of prior years and defendant's curious argument that after all, Treasury regulations, bulletins and interpretations are not too persuasive, there still stands Sec. 4242, Title 26 U.S.C. and it requires a tax on the charges for club lockers, boatwells and skipper's cards (which allow the free and experienced use of the club's sailboats). I also conclude that the charge for the club lockers, boatwell, and skipper's card by the Detroit Yacht Club was for a period of use by plaintiff of more than 6 days.

Does the applicable statute of limitations (Sec. 6501, Internal Revenue Code 1954) bar assessment and collection of the excise tax applied to charges for the skipper's card for the years 1955, 1956 and 1957?

On January 15, 1960, plaintiff paid $7.20 in excise tax for the annual charge (1955–57) for the club's skipper's card. This resulted from an audit of the books of the Detroit Yacht Club and a determination that the amount was due. Plaintiff claims that the tax paid by him was paid more than 3 years after the date on which the charge to which it was related was paid to the club and more than 3 years after the quarterly return was filed by the club with resepect to the period in which the charge was made.

The government contends that since the club did not include the requisite amounts in its return, that the statute of limitations does not apply. It urges Title 26, Sec. 6501(c) (3):

> "In the case of failure to file a return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time."

 The club dues tax is a divisible tax; each charge made for the use of a club facility constitutes a taxable transaction. See Flora v. United States, 357 U.S. 63, 78 S.Ct. 1079, 2 L.Ed.2d 1165,

---

1. As this opinion is filed, word is received of two decided cases: Porter v. United States, D.C.S.D.Tex., 197 F.Supp. 171 and McDonald v. United States, D.C.E.D. Ky., 196 F.Supp. 415. The first decided August 4, 1961, and the latter, August 3, 1961.

affirmed on rehearing, 362 U.S. 145, 80 S.Ct. 630, 4 L.Ed.2d 623. A failure to report a taxable transaction where the tax involved is divisible and a combined tax return is used permits the commissioner to assess the deficiency at any time since the statute of limitations has not started to run. In People's Outfitting Co. v. United States, 58 F.2d 847, 851, 74 Ct.Cl. 419, the Court said:

"It is true that a return was filed for each month involved in the case, but this was, as it seems to us, a combined return, for the tax was on each sale, not on the total sales for the month, and while the department, by presenting to the taxpayer these forms, directed that the returns should be combined or consolidated for the month, this was merely for convenience and did not change the law. We think, therefore, that there was no return made of the sales of these articles upon which it is agreed no tax was paid. If no return was made, the statute of limitations does not bar the counterclaim."

It would be strange indeed to hold that the statutory period of limitations had run as to taxes otherwise required to be paid but which were omitted from such return.

Since the Detroit Yacht Club did not make a return as to the charges for skipper's cards and did not collect the excise tax thereon, the government is not barred by the statute of limitations.

For these reasons plaintiff prevails as to the excise tax erroneously levied and collected from him on the charges made for the magazine "Main Sheet" and defendant prevails as to the taxes levied and collected on the charges made for the lockers, boatwell and skipper's card.

An order consonant with these findings of fact, conclusions of law and this opinion may be presented by the defendant.