**S. M. JONES**

v.

**The UNITED STATES.**

**S. M. JONES & COMPANY, Inc.**

v.

**The UNITED STATES.**

Nos. 43–61, 44–61.

United States Court of Claims.

Jan. 20, 1967.

Raymond F. Garrity, Washington, D. C., attorney of record, for plaintiffs. Carl A. Phillipps and Garrity, Ferguson & Phillipps, Washington, D. C., of counsel.

D. Knox Bemis, Washington, D. C., with whom was Asst. Atty. Gen. Mitchell

Rogovin, for defendant. Lyle M. Turner and Philip R. Miller, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

## OPINION

LARAMORE, Judge.

We are here presented with some novel questions relating to the excise tax on the transportation of property. Sections 3475(a) and 4271(a) of the Internal Revenue Codes of 1939 [1] and 1954,[2] respectively, impose a 3-percent tax "upon the amount paid within or without the United States for the transportation of property by * * * motor vehicle." This tax is to be paid "by the person making the payment subject to the tax;" however, it is to be collected and returns are to be filed by the person who receives the payment. Int.Rev.Code of 1939, § 3475(c); Int.Rev.Code of 1954, §§ 4271 (d), 4291. The key issue here is whether a shipper can be held liable for this tax on many shipments made over a 16-year period when it is apparent that the truckers have either never filed returns or specifically collected the tax. Subsidiary to this are questions of the proper burden of proof, the applicable statute of limitations, the application of the tax to icing and unloading service charges, and the propriety of adding interest to plaintiff's deficiency.

The plaintiff in No. 43–61 is Mr. S. M. Jones, suing in his individual capacity; the plaintiff in No. 44–61 is S. M. Jones & Co., Inc., suing in its corporate capacity. The corporate plaintiff became successor to the individual plaintiff's business in March 1957, so for the period before us, 1942 to 1958,[3] Mr. Jones' claim for refund comprehends the period from 1942 through March 1957, and the corporation comprehends the remainder. The actions have been consolidated, and

---

1. 26 U.S.C. § 3475(a) (1952 Ed.).

2. 26 U.S.C. § 4271(a) (1952 Ed.Supp. II), repealed June 30, 1958, 72 Stat. 260.

3. The actual period is December 1, 1942 through September 30, 1958, 15 years and 10 months.

in the interest of simplicity we shall refer to one plaintiff.

Plaintiff was in the farm produce business with farms in New Bern, North Carolina and Canal Point, Florida. From these locations he shipped most of his fresh produce to the wholesale markets in trucks owned and operated by small, independent proprietors. In Florida, plaintiff relied on brokers to supply truckers for his transportation requirements. The fee for this service ranged from 5 to 7 percent of the freight charge,[4] and was absorbed by the trucker; i. e., plaintiff paid the broker the full freight charge and the broker turned over 93 percent to the trucker. In North Carolina, however, plaintiff generally contacted truckers directly without consulting a broker. In these instances, plaintiff paid the trucker the full freight charge and the trucker was spared any commission. Arrangements with truckers, particularly in North Carolina where they dealt directly with plaintiff, were typically informal. Thus plaintiff frequently advanced individual truckers amounts to cover the costs of icing en route, unloading, and even gasoline and other foreseeable transportation expenses. Such advances were subsequently deducted from the final payments which were made upon receipt of signed bills of lading evidencing delivery to the consignee and signed receipts showing payment for icing, unloading, and other compensable services. Freight rates were similarly left to informal arrangement, however, the practice with rare exception was to pay the "going rate," whether to the broker or the directly-hired trucker. That this was a satisfactory arrangement for all concerned is reflected by the fact that many truckers never discussed rates on the assumption that plaintiff would pay the same to all. Where brokers were involved, the arrangements were more businesslike; plaintiff received invoices which carefully itemized all charges. It is beyond dispute that plain-

tiff's payments of freight charges, excluding charges for icing and unloading, were subject to the 3-percent tax.

During a 1958 audit of the excise tax accounts of several truckers who regularly transported produce for plaintiff, an Internal Revenue Service Agent learned that these truckers had either not been collecting the excise tax from plaintiff or paying it over to the government. Rather than proceed against these and other truckers, however, the agent decided to center investigation on plaintiff. This was understandable in view of the fact that in two years of the period in question, plaintiff dealt with 165 different truckers. Reconstruction of the facts was extremely difficult, and we shall limit ourselves here to a summary of the accounting problems and their resolution. For the quarterly periods ending December 31, 1942 through December 31, 1946, the agent relied on the cash journal for information on the tax. He found that before June 1946, plaintiff's bookkeeper periodically marked some freight paid figures with the letter "T". He concluded that this indicated that the tax had been paid in those designated transactions. He also found that the bookkeeper had created an account entitled "reserve tax on freight," and by extrapolation from the 3-percent tax factor and the freight charges not marked with a "T", concluded that this was a reserve for the transportation tax. Further examination proved that this reserve was never reduced by payments of the tax, but was eliminated altogether in 1953 when it was added to net worth. The second step in the agent's reconstruction of the unpaid tax was an examination of the cash journal, duplicate check copies, and North Carolina office records to determine what truckers apparently never specifically collected the tax from plaintiff. In step three, the agent assumed that those truckers who apparently did not collect the tax from 1942 through 1946 and from 1956 through

---

4. For the purpose of computing brokerage commissions, the "freight charge" did not include costs of icing or unloading, or the transportation tax (in those instances when the tax was paid).

1958 did not collect it from 1947 through 1954, and therefore concluded that the tax was still due in the amount of three percent of the total freight disbursements (apparently including icing and unloading charges) made to such truckers. For 1955, the agent overcame the problem of missing records by estimating a probable unpaid tax on the freight payment figure reported in the individual plaintiff's income tax return. In the case of Mr. Jones, the agent computed a deficiency of $48,571.35 for the period from December 1, 1942 through March 31, 1957. The figure for the corporation was $5,633.95 for the period from March 31, 1957 through September 30, 1958. These amounts were paid to defendant, plus interest of $23,791.84 for Mr. Jones, and $556.28 for the corporation, in September 1959.

Subsequently, plaintiff had A. M. Pullen & Co., a firm of certified public accountants, reconstruct the freight figures for most of the period in issue. Their report covers all but the period from December 1, 1942 through December 31, 1945, the omission being a result of incomplete records. The parties in pretrial proceedings agreed that this report was a valid reconstruction and stipulated that the transportation tax was paid by plaintiff *at least* to the extent that the Pullen report concluded. We note that for the period from 1946 through the first two quarters of 1958 the report shows total freight charges of $2,041,-321.08, or $2,137,349.58, if icing and unloading charges are included. Neither the parties nor our Commissioner appear to have drawn any specific inferences from this, but we think it is instructive to apply a 3-percent tax to the freight charge computations and compare it with the tax definitely paid. For the "freight-only" total the tax would be $61,239.63; it becomes $64,120.49 by adding icing and unloading charges. This compares with $14,931.03, the agreed upon minimum tax-paid figure. Assuming that the

minimum tax-paid figure is also the maximum (as the Internal Revenue Service agent would), the inference is that there was a deficiency of $46,308.60 using the "freight-only" total as a tax base, or $49,189.46 using the freight plus icing and unloading charge. Of course, this "deficiency" would have to be augmented by some unknown amount for the period from December 1, 1942 through December 31, 1945 which is not covered by the Pullen report. Very likely a reconstruction of those three years would show a total "deficiency" of at least $10,000. Whatever the correct figure might be, it is significant to note that the Pullen report with some addition produces a "deficiency" of roughly $60,000 (using either a "freight-only" tax base or freight plus icing and unloading) which is close to the $54,205.30 computed by the Internal Revenue Service agent and paid by plaintiff. We think it is fair to say that if the agent correctly concluded that the truckers neither collected nor paid the reconstructed deficiency and that plaintiff was liable, the deficiency plaintiff was required to pay was reasonable. In fact, by agreeing to the Pullen report findings, it seems that plaintiff implicitly accepts the reasonableness of the agent's calculations, except the inclusion of the icing and unloading charges in the tax base.

## I. *Statute of Limitations*

The threshold legal issue concerns the application of the statute of limitations. Plaintiff asserts that the bulk of his claim made in his individual capacity should be granted because assessment of the deficiencies was barred by the 4-year provision of the 1939 Code and the 3-year provision of the 1954 Code.[5] Int.Rev.Code of 1939, § 3312; Treas.Regs. 113, § 143.51; Int.Rev.Code of 1954, § 6501. Plaintiff does not deny that both limitations provisions impose no time bar where returns are not filed, nor does he deny that some of the truck-

---

5. The assessment date was September 21, 1959, so plaintiff's theory would entitle him to a refund of all taxes paid with respect to the period before September 21, 1956.

ers never filed returns. His argument is that the truckers presumptively carried out their statutory duties of collecting the tax and filing returns and that the defendant has not been able to rebut this presumption. Allied to this is plaintiff's notion that the truckers were absorbing the tax as part of the freight rate (and presumptively filing returns) wherever it was not specifically paid by plaintiff and collected and returned by a trucker.[6] We understand the sole question, as framed by the parties,[7] to be whether returns were actually or constructively filed. We conclude here, as we do in detail on the merits, that if there is a presumption that the truckers performed their statutory duties, the defendant has rebutted it. Once rebutted, it is as though there were no presumption and plaintiff has not persuaded us that returns were filed, either as a matter of fact or law. Since it is conceded that the statute of limitations does not run if a return is not filed,[8] the defendant was not barred from assessing the deficiencies.

## II. Taxability of Freight Charges

On the merits, plaintiff attempts to avoid the ordinary tax case burden of proof [9] by arguing there should be a presumption that the truckers collected and paid the taxes. This is supposed to follow from two different aspects of the tax scheme, the first being that as a matter of policy (or perhaps logic) it should be presumed that the addressees of a statute will perform the duties it requires of them. See e. g., Bank of United States v. Dandridge, 12 Wheat. (25 U.S.) 64, 6 L.Ed. 552 (1827); Athens Roller Mills, Inc. v. Commissioner, 136 F.2d 125 (6th Cir. 1943). In setting up the transportation tax scheme, Congress placed the duty of collection and filing returns on truckers; it would certainly be reasonable to assume in theory, at least, that most truckers would comply with the statute, if for no other reason than to avoid penalties. The second aspect favoring a presumption is the fact that the government should be in a better position to produce evidence showing whether the truckers as its "collecting agents" did or did not absorb the tax or collect it and pay it over to the Internal Revenue Service. On its theory then, plaintiff should recover unless defendant rebuts the presumption, and even in that event, plaintiff might still be able to carry what would be a burden of persuasion. We offer no opinion on the theory that the presumption is needed and a departure from the normal burden of proof warranted, because in our view any presumption there might be has been rebutted.[10]

6. The defendant did admit in its initial answer that if plaintiff could prove it had paid the truckers the tax or that the truckers had collected it, he would be free of further liability even though no returns were filed, although it is not clear that this would be the result just as a statute of limitations principle.

7. In his briefs and oral argument, plaintiff made it clear that he was not asking the court to go into conflict with two Sixth Circuit cases holding that failure of the person charged with the duty to collect the tax to file returns keeps the limitations period open *both* as to the "collector" *and* the person whose duty it is to pay to the collector. McDonald v. United States, 315 F.2d 796 (6th Cir. 1963); Hulette v. United States, 315 F. 2d 826 (6th Cir. 1963). See also, Cohan v. United States, 198 F.Supp. 591 (E.D. Mich.1961).

8. See n. 7, supra.

9. It is well established that taxpayers have the burden of proof in tax refund cases.

10. Presumptions are frequently useful where the probabilities are known. Thus, in recurring fact situations, it is "common sense" that "the proof of fact A renders the inference of the existence of fact B so probable that it is sensible and time-saving to assume the truth of fact B until the adversary disproves it." McCormick, Evidence § 309 (1954). Put differently, "when a designated basic fact or aggregate of facts exists, existence of another fact or aggregate of facts, called the presumed fact or facts, must be assumed in absence of adequate rebuttal." Maguire, Evidence: Common Sense and Common Law 183 (1947). In the present case, the basic fact (fact A) would be that the truckers had a legal duty to collect and pay the tax. The presumed fact (fact B) would be that they carried out their duty (because most persons with

**447**

Our Commissioner found: "[Mr. Jones'] assumption that the truckers who were not collecting the tax as such were absorbing it was (to the extent that such assumption was actually made, as hereinafter indicated) a reasonable assumption." "Thereinafter," the Commissioner "indicated" the evidence warranted the conclusion that Jones "actually and reasonably made the assumption during the earlier years of the imposition of the tax; but * * * that his insistence upon it in later years reflects more of a rationalization than an actual state of mind." More specifically, the Commissioner noted that Jones "was well aware of the fact" that the small, independent truckers he dealt with were not reliable tax collectors, and in the later years became aware of the further fact that those truckers who did not ask for the tax, either at the time of billing or later, were not making returns or paying the tax. Since defendant in its answer concedes it is the law that plaintiff's tax liability would be discharged if he in fact paid the tax to the truckers, whether specifically or by absorption, these findings require close scrutiny. At first glance, it appears that on either a presumption or ordinary burden of proof analysis the Commissioner concluded that Jones established as a fact that he thought he had discharged his liability to some extent. This is undermined by the parenthetical comment— i. e., "(to the extent that such assumption was actually made * * *)," and by the findings relating to the later years. Normally, we would be reluctant to look behind such a finding as it involves matters of demeanor and credibility, but to determine just how we should read all the findings to resolve possible inconsistencies, we have made an independent examination of the transcript.

After looking at Jones' and the truckers' testimony, we find that if it was reasonable for Jones to assume the truckers were absorbing the tax, it was reasonable only as a matter of bare logic or rationalization. Jones said the following on direct examination: " * * * if he [the trucker] failed to collect it [the tax] at any time, even the time the freight was due or at a later date, then we assumed or understood that he was absorbing the tax, for the reason we knew the tax was payable, the tax was collectible by the trucker and the trucker was required to remit to the Treasury Department the tax, *there was nothing else we could assume or understand from these actions.*" (Emphasis added.) It seems to us that "these actions" lead to another assumption which is that the truckers were not paying the tax either because they did not know about it or because they thought they could "get away" with not paying it. However, we are not willing to attribute to Jones such an assumption, with the attendant inference that he wilfully participated in the evasion, because the Commissioner who observed his demeanor did not conclude this nor did the defendant impeach Jones' testimony on cross-examination. So we are left with the task of explaining how Jones could have "reasonably" assumed the tax was absorbed, yet still be liable for the tax. This can be done by differentiating between Jones' subjective views and an objective analysis of the facts. Subjectively, Jones may have deduced the tax was being absorbed by the fact that the truckers, who presumably knew of their collection duties, did not ask for payment. Put differently, Jones may have thought that he was being shrewd in not specifically mentioning the tax to the truckers and was thereby passing the tax on to them. Objectively, however, Jones' unilateral assumption was not so "reasonable" as to permit the conclusion that there was the meeting of minds necessary

such legal duties carry them out). Since the basic fact is not disputed, plaintiff argues the presumed fact stands until rebutted. The defendant has introduced considerable evidence to rebut the presumed fact and support a finding of its "non-existence." "[W]hen such evidence has been introduced, the existence or non-existence of the presumed fact is to be determined exactly as if no presumption had ever been applicable in the action." Field and Kaplan, Civil Procedure 536 (1953). See Model Code of Evidence rule 704 (1942).

for a finding that the truckers were absorbing the tax under the shipping contracts. See Darn v. Wiseman, 94 Ga. App. 216, 94 S.E.2d 65 (Ct.App.Ga.1956).

The facts upon which we base the above conclusion and the conclusion that defendant successfully rebutted any presumption are developed primarily through the testimony of plaintiff, his assistant bookkeeper, and seven truckers. It is quite clear to us that the truckers had no intention of paying the tax unless it was turned over to them and itemized at the time of payment of the freight charges. It seems that the "scuttlebutt," as denominated by one trucker, was that there was no duty to pay the tax if the check did not specify it. One trucker testified without objection that plaintiff's accountant said that he would always pay the tax on request. Indeed this was the practice, as Jones conceded in his testimony. Plaintiff's assistant bookkeeper testified that it was his understanding the tax had not been paid where the check failed to show a tax item. He also explained the reserve, which was used in the early years and "funded" in the exact amount of the unpaid tax, as a contingent liability account established in recognition of the possibility that truckers might have to be paid the tax in the future. Plaintiff, himself, made no effort in his testimony to cast this evidence in any special light; he simply focused on trying to prove the inconsistent fact that he assumed the tax was being absorbed.

It should be noted that there are some facts, albeit few, in plaintiff's favor.

Thus it is true that most, if not all of the truckers, who did not collect the tax were carriers for the North Carolina farm. Brokers were not used in North Carolina so the truckers saved brokerage commissions which were usually more than double the tax. It does not follow from this, however, that the truckers absorbed the tax; it simply shows that they could have. It is also a fact that many excise taxes, and particularly sales taxes, are absorbed in the price of goods and services without notice to the purchasers. But this does not mean that the practice for the transportation tax is or should be the same. In short, the weight of the evidence leaves no doubt that the tax was neither being absorbed nor paid. The testimony of the seven truckers, coupled with the other evidence in the case, is enough to rebut any presumption. To use a professorial analogy, the defendant has returned the ball to plaintiff's court, and he has not countered by persuading us that the evidence, stripped of any presumption, entitles him to recover.[11]

### III. Icing and Unloading Charges

■ It appears from the facts, and the government seems to agree, that the Internal Revenue Service agent used total freight charges, i. e., the unit charge based on weight and miles *plus* icing and unloading costs, as the tax base. Plaintiff recognizes that section 143.1(d) of Treasury Regulations 113 defines "transportation" (the tax is imposed on the amount paid for "transportation") as including icing and unloading as "accessorial services furnished in connection

11. The burden of proof has been analogized to a game of tennis in which the plaintiff as server must first get the ball into the defendant's court. He does this by having sufficient pleadings (satisfying the pleading burden) and by producing sufficient evidence (satisfying the production burden). If there is a presumption, plaintiff's production burden is satisfied by producing enough evidence to establish fact A (from which fact B is presumed). Plaintiff has an additional burden, however, and that is to persuade the fact-finder that the evidence establishes the facts necessary for him to recover (satisfying the persuasion burden). In the present case, plaintiff pleaded and produced evidence to support his theory of recovery. His presumption theory further helped him to get the ball into defendant's court. The defendant produced counter-evidence to rebut any presumption and to persuade the fact-finder that plaintiff's version of the facts was not correct. This put the burden on plaintiff to counter the defendant's evidence and return the ball to defendant. Plaintiff has not been able to carry this burden of persuasion. See 9 Wigmore, Evidence § 2487 (3d Ed. 1940) for a diagram which helps to visualize this process. See also n. 10, supra.

with a transportation movement." Plaintiff also recognizes that in Armour & Company v. United States, 169 F.Supp. 521, 144 Ct.Cl. 697, cert. denied, 361 U.S. 821, 80 S.Ct. 67, 4 L.Ed.2d 66 (1959), this court overruled Swift & Company v. United States, 144 F.Supp. 956, 136 Ct.Cl. 394 (1956), and Armour & Company v. United States, 159 F.Supp. 380, 141 Ct.Cl. 566 (1958), and followed Beber v. United States, 167 F.Supp. 169 (N.D.Calif.1958), which held that under the "re-enactment doctrine" the regulations defining "transportation" were valid so that charges for icing and salting performed by carriers should be included in the tax base. He argues the present case may be distinguished by the fact that his icing and unloading payments were simply reimbursements to the truckers for services rendered by persons *not* "engaged in the business of transporting property for hire." Support for this position, especially as to the icing charges, is given by the Commissioner's findings that the icing and unloading services "were rendered by persons unidentified with the carriers (truckers) except insofar as the carriers selected and paid the icing stations and the laborers who unloaded or helped to unload," and that in selecting the icing stations, "the truckers were not rendering services as independent contractor carriers, but were acting as interim agents of plaintiffs." The Commissioner concluded the truckers were acting as independent contractors as to the selection of laborers for unloading, however. We agree with defendant that plaintiff has not shown a sufficient distinction to escape the application of the second *Armour* case.

The tax is imposed on "amounts paid [for transportation] to a person engaged in the business of transporting property for hire," and plaintiff clearly paid the charges to the carriers. It is true the carriers did not physically perform the services, but they were responsible for seeing that the produce was iced en route and unloaded at the destination. This being the case, it seems to us the icing and unloading services were part of the truckers' job of transporting the produce. Plaintiff is really asking us to view the arrangement as one in which the icing stations and unloaders were working for him. He assumes the railroads in the prior cases used their own icing stations, but we are not certain that was always the case or that it would have made any difference. In our view, nothing is served by characterizing the truckers as "interim agents" for purposes of icing services. We doubt an analysis that makes the carrier the agent of the shipper for limited purposes can play any useful role here because it builds into the statute even more anomalies than already exist. The effect of this decision is to tax payments *made to carriers* for the actual cost of moving the cargo plus the costs of preserving it and unloading it where the carrier supervises all activities. If a shipper moves cargo himself and ices it and unloads it himself, there will be no tax because there is no payment to "a person engaged in the business of transporting property for hire." In the in-between case, there might be a taxable payment to a carrier for the moving, but non-taxable payments to icing stations or unloaders if they bill the shipper directly. This may seem artificial, but we think it is preferable to an agency analysis which would require us to draw lines between small and large carriers. In other words, we are not prepared to say that in this case the truckers were agents for the special purpose of icing, yet in some other case involving larger carriers which have their own icing facilities, they are not agents and the icing is therefore part of "transportation."

The unloading charges are still more clearly "transportation" under the *Armour* test. We agree with our Commissioner that the truckers acted completely independently in hiring laborers for this purpose and that this service was part of the transportation process. It is true the truckers were reimbursed for the unloading charges as for the icing charges and this might suggest that the truckers were simply accommodating plaintiff. We

thought this was not a correct characterization of the icing charge situation; our identical conclusion as to the unloading charges is bolstered by the additional fact that plaintiff customarily paid the truckers only one-half the unloading fee. Certainly the other half which was absorbed became part of the charge for moving the produce. We are unwilling to make the truckers schizophrenic agents.

### IV. *The Propriety of Interest*

 There remains the question of interest. Plaintiff recognizes that the transportation tax regulations provide: "all taxes are due and payable * * * without assessment * * * or notice * * *," and if not so paid, "there shall be added, as part of the tax, interest at * * * 6 percent * * *." Treas. Reg. 113, § 143.54. He argues this general rule is inapplicable, however, because "[i]nsofar as [he] knew, [he was] paying [his] admitted tax liabilities, either as such or by way of absorption thereof by the truckers, and it was through no fault on [his] part that the Government waited some sixteen years in the matter before pursuing it." We are also asked to analogize the present case to Rev.Rul. 58–300, 1958–1 Cum.Bull. 454, which held that a taxpayer who refuses to pay his tax to the person whose duty it is to collect it cannot be required to pay a delinquent filing penalty under section 6651 of the 1954 Code because such a taxpayer has no duty to file a return. Plaintiff's theory is that if a taxpayer who refuses to pay is spared the penalty, then the taxpayer who not only had no duty to file a return but also never refused to pay the tax should be spared interest "which is in the nature of a penalty." The logical extension of such a theory is that interest should apply only to parties responsible for collecting the tax. This argument is inadequate in two respects. Firstly, interest is not a penalty but a charge for the use of money, and the government unquestionably was deprived of the use of these taxes before assessment. Secondly, the facts here are other than plaintiff has alleged. We concluded earlier that objectively plaintiff should

have known he was not paying his "admitted tax liabilities." It is indeed unfortunate, and perhaps inexcusable, that the government waited 16 years to assess the tax, but this can provide no amnesty from the requirement of compensating the government for use of money which plaintiff knew it should have had.

In summary, we hold that plaintiff was liable for the transportation tax assessed in 1959, that the assessment was not time-barred under plaintiff's theory that returns were presumptively filed, that the tax base properly included the icing and unloading charges, and that the assessment properly included interest. Accordingly, the petitions are dismissed.